607 A.2d 1371

STATE OF NEW JERSEY IN THE INTEREST OF D.J.C.

Superior Court of New Jersey
Appellate Division

Submitted February 20, 1992—Decided June 16, 1992.

Before Judges KING, DREIER and GRUCCIO.

*John J. Fahy*, Bergen County Prosecutor, attorney for appellant State of New Jersey (*Jeal Sugarman*, Assistant Prosecutor, of counsel and on the letter brief).

No brief was filed by or on behalf of respondent, D.J.C., a juvenile.

The opinion of the court was delivered by

GRUCCIO, J.A.D.

This is an appeal from a dismissal of the State's juvenile complaint for failure to provide discovery. The alleged conduct, if committed by an adult, would constitute second degree aggravated assault, *N.J.S.A.* 2C:12-1b; attempted theft, *N.J.S.A.* 2C:5-1 and 2C:20-3; eluding a police officer, *N.J.S.A.* 2C:29-2b and simple assault, *N.J.S.A.* 2C:12-1a(1). These complaints were filed February 4, 1991, relating to an incident that occurred on January 30, 1991.

A car operated by D.J.C. pulled up to S.N., age 10, who was selling American flags by the curb near his home. His father, Lt. N., a lieutenant in the Rutherford police department, witnessed the incident. V.C., a passenger in the car driven by D.J.C., asked S.N. what the flags were made of and asked to feel them. V.C. leaned out of the car and attempted to grab the flags from the child's hand. The vehicle began to pull away from the curb. Lt. N. signaled the driver to pull over, but, instead, he sped off. Lt. N. got into his personal car and pursued the suspect. At one point, he got the car to pull over, stepped out of his car, held up his badge and ordered the driver to pull the vehicle over to the curb. The driver sped off. Lt. N. pursued him, and after making several turns, J.D.C. failed to stop at a stop sign and nearly crashed his car into Lt. C., an off-

duty police officer, who then joined the pursuit. D.J.C. was finally stopped by traffic and both officers exited their vehicles. Lt. C. approached D.J.C.'s vehicle from the front and Lt. N. approached the driver's door. Lt. C. held up his arms and instructed the driver to get out of the car. D.J.C. accelerated the car and struck Lt. C., knocking him onto the hood and into the windshield. At the same time, the car ran over Lt. N.'s right foot, went over the sidewalk and left the scene. The car was subsequently traced to D.J.C.'s home. Fortunately, Lt. N. suffered no injury to his foot, and Lt. C. suffered minor back injuries.

A trial date of March 11, 1991, was assigned, which was 40 days following the incident. On March 5, 1991, D.J.C.'s attorney requested an adjournment of the March 11th date since he had not received the State's discovery. That request was denied. The State appeared on March 11, 1991, and also requested an adjournment, since two witnesses could not be secured and the local police had not yet furnished the prosecutor's office with the reports to be forwarded to defense counsel. The assigned judge expressed distress over other cases in which police officers harassed families by "writing bogus complaints" and not showing up, and dismissed all the complaints against D.J.C.

The State immediately moved for reconsideration, but received no answer from the judge. Accordingly, on April 24, 1991, the State filed a notice of appeal before the time to appeal expired. The judge then responded by an opinion letter dated July 22, 1991, in which he stated that the motion had been mislaid when he moved his chambers in May 1991. He further stated that, in the four months during which he had been hearing juvenile cases, he found that police officers often did not respond to subpoenas and discovery is not expeditiously obtained by the prosecutor's office and provided to the attorneys for juveniles. His stated policy was "that all juvenile

cases be adjudicated within three months of filing of the complaint, 30 days if the juvenile is in the Detention Center." [1]

Here, however, D.J.C. was not detained at any time during the pendency of the proceedings. We find the judge's action wholly unwarranted and reverse.

There is an overriding policy which is firmly imbedded in our law which disfavors the procedural dismissal of cases, except on the merits. Procedural dismissal is a choice of *last* resort not one of first instance. Surely, dismissal should not ordinarily, if ever, be used punitively or as a method of calendar control.

Early in the era of our modern court system we addressed the issue of adjournments in civil matters and concluded a dismissal was improperly entered. We said that "[w]e must never forget that courts exist for the sole purpose of rendering justice according to law. No eagerness to expedite business, or to utilize fully the court's time, should be permitted to interfere with our high duty of administering justice in the individual case." *Pepe v. Urban*, 11 *N.J.Super.* 385, 389, 78 *A.*2d 406 (App.Div.1951); *and see Allegro v. Afton Village Corp.*, 9 *N.J.* 156, 161, 87 *A.*2d 430 (1952).

With such precedent established in the very early years of our modern court system, we signaled our intention that cases be heard on the merits. In *Zaccardi v. Becker*, 88 *N.J.* 245, 253, 440 *A.*2d 1329 (1982), our Supreme Court said that because dismissal is a severe sanction, it should be used sparingly, and in *Audubon Volunteer Fire Co. No. 1 v. Church Const. Co.*, 206 *N.J.Super.* 405, 407, 502 *A.*2d 1183 (App.Div.1986), we

---

[1]The Pathfinders Report setting forth Principles and Operating Procedures for the Family Division provides:

Before the completion of each in-court proceeding, the next date certain shall be fixed and the juvenile served with notice of the next hearing. Any adjournments shall be granted to a stated date certain. Adjournments in non-detention cases shall not be granted beyond 90 days from the docketing of the complaint except for extraordinary and compelling reasons.

pointed out many ways, short of dismissal or default, to deal with problems of calendar control. There, we said that "[u]ntil courts have exhausted means of performing their shepherding function which do not terminate or deeply affect the outcome of a case, they ought not to bar a litigant's way to the courtroom," and in *Georgis v. Scarpa*, 226 *N.J.Super.* 244, 254, 543 *A.*2d 1043 (App.Div.1988), we stated:

> Our primary focus in the administration of justice is the delivery of quality justice; the elements of which are: (1) adequate pretrial preparation and a fair trial, which in effect is due process; (2) expeditious disposition, and (3) economically effective operation. The court must balance these elements and never favor the latter two above the first, fair play.

Indeed, here, the words of Justice Potter Stewart, then sitting in the United States Court of Appeals, are particularly apt: "The prompt and vigorous administration of the ... law is to be commended and encouraged. But swift justice demands more than just swiftness." *Henderson v. Bannan*, 256 *F.*2d 363, 390 (Stewart P., dissenting) (6th Cir.1958), *cert. den.*, 358 *U.S.* 890, 79 *S.Ct.* 129, 3 *L.Ed.*2d 118 (1958).

In the administration of the criminal courts where the trial court granted defendant's motion to suppress and dismissed the indictment because of the arresting officer's inability to be present, we reversed and said:

> The extreme remedy of granting the motion to suppress, a remedy tantamount to dismissal of the indictment, was too severe and disproportionate to the circumstance. As we observed in *State v. Porro*, 175 *N.J.Super.* 49, 52 [417 *A.*2d 573] (App.Div.1980), in reversing an order of the Law Division dismissing the indictment on the ground of prosecutorial misconduct,
>
>> But dismissing the indictment does not correct the error; it serves only to deprive the State of an opportunity to try the issues raised by the indictment. Dismissal does more than redress the wrong done to defendant; it effectively grants him immunity from prosecution. If the assignment judge was of the view that the prosecutor's conduct was so egregious as to call for disciplinary action, he might have referred the matter to the District Ethics Committee or the Administrative Director of the Courts. *See R.* 1:20. Dismissal of the indictment was too drastic a remedy; suppression of the improperly elicited testimony would have been a sufficient and more appropriate remedy.
>
> As Judge Pressler has noted "the developing rule appears to be that the indictment will not be dismissed if the integrity of the criminal trial can be protected by alternative measures and lesser sanctions." *Pressler* Current *New*

*Jersey Court Rules*, Comment *R.* 3:10–2, citing *State v. Sugar*, 84 *N.J.* 1 [417 *A.*2d 474] (1980). As this court stated some years ago, "no eagerness to expedite business, or to utilize fully the court's time, should be permitted to interfere with our high duty of administering justice in the individual case." *Pepe v. Urban*, 11 *N.J.Super.* 385, 389 [78 *A.*2d 406] (App.Div.1951); *see Allegro v. Afton Village Corp.*, 9 *N.J.* 156, 161 [87 *A.*2d 430] (1952); *Nadel v. Bergamo*, 160 *N.J.Super.* 213, 218 [389 *A.*2d 500] (App.Div.1978).

*State v. Audette*, 201 *N.J.Super.* 410, 415, 493 *A.*2d 540 (App. Div.1985).

Turning to the Municipal Courts and the practice there, again we observed that dismissal was a recourse of last resort and that costs or sanctions would be an appropriate remedy.

We next turn our attention to the issue of the imposition of costs or sanctions. *R.* 1:2–4(a) provides for payment of costs to an adverse party as a condition of adjournment even where the State is the offending party in a criminal action. *State v. Audette*, 201 *N.J.Super.* 410, 493 *A.*2d 540 (App.Div. 1985). We have frequently cautioned that in the administration of justice dismissal must be a recourse of last resort. (Citations omitted). The problem of delay and its impact on substantial justice is generally discussed by Justice O'Hern in *[State v.] Gallegan*, 117 *N.J.* [345] at 355 [567 *A.*2d 204].... [We concluded] that a municipal court judge should not automatically dismiss a drunk-driving complaint when the police officer fails to appear. The judge should direct the prosecutor to attempt to bring the officer to court immediately or, in appropriate cases, postpone the hearing.

*State v. Prickett*, 240 *N.J.Super.* 139, 147, 572 *A.*2d 1166 (App.Div.1990). What we have observed in the civil, criminal and municipal divisions of our court system is equally applicable to the Family Part. Indeed, abiding by the time limitations promulgated in the Pathfinders Report, dismissal here was not warranted.

Clashes and conflicts will occur in the adjudicative processes of all our courts. The judge, however, must remain the neutral arbiter of the proceedings and must deal with what has been described by legal researchers as the "local legal culture." [2]

---

[2]For a discussion of "local legal culture" see Thomas W. Church, Jr., *Examining Local Legal Culture*, 3 *Am.B.Found.Res.J.* 449 (1985); Roger A. Hanson and Joy A. Chapper, *Organizing the Criminal Appeals Process: The Views of Judges, Government Attorneys and Defense Counsel*, 72 *Judicature* 239 (1989).

This expression typically depicts the justice-related environment in its broadest sense and, therefore, includes civil, criminal, family and juvenile judges, lawyers and related agencies and services.

Juvenile cases involving issues of freedom, rehabilitation, custody, punishment and sanctions imposed by the juvenile courts are typically accorded highest priority in our courts. The attorneys practicing in those courts must be sensitive to the demands made on limited resources. Hence, the frequent exercise of comity is required in the juvenile justice system.

If that segment of the local legal culture that we call the juvenile justice system ceases to work harmoniously, the dysfunction can have startling effects. Were a public defender to demand trial of all cases, or a prosecutor to decline to offer any reasonable options, the system could quickly come to a halt. The resulting paralysis would adversely affect the movement of all juvenile cases. Unreasonable refusal to cooperate and to act as part of the system may signal degradation of the process.

In all cases, the reasons for intractability should be explored and necessary accommodations made. In some instances, failure to cooperate may be motivated by a professional determination, personal animus or simple failure to communicate. The communication failure may be caused by lack of organizational linkages. These can be forged and the processes can be strengthened. If, however, communication and cooperation is blocked by precipitous action, the remedies are more difficult to apply.

Proper judicial management requires joint problem-solving.[3] All parties in the criminal justice system, to the exclusion of

---

[3]For instance, in attempting to modernize our criminal justice system and provide for speedy criminal trials, we saw the necessity of involving all segments of the system throughout the State. Recognizing the diversity in size, nature of crime, traditions and personnel among the counties, we involved a comprehensive group of persons concerned with criminal delay reduction problems. They included assignment and presiding judges as heads of the

none, must be included for efficient and comprehensive handling of criminal cases. The success experienced from the inclusion of these persons compels a similar action in the Family Division. Indeed, the Pathfinder's Report[4] is part of the blueprint for the effective disposition of juvenile cases in the Family Division, and is illustrative of the system we urge here.

If education, adjustment and understanding are not undertaken, the system, and not simply a single case, may suffer. The action here was an impulsive reaction and the effect it had was negative and unproductive. As judicial managers, it is important that we address and solve the root problems affecting the administration of justice. We fully recognize the importance of expedition in the adjudication of juvenile matters; however, expedition "must supplant languor, but never at the expense of justice." *Amo v. Genovese*, 17 *N.J.Super.* 109, 111, 85 *A.*2d 529 (App.Div.1951).

Here, there is absolutely no valid reason for the dismissal. As the State points out, the allegations are very serious; the time span between the date of the alleged offense, receipt of the complaints and first trial date was short (far less than the time limit fixed for the disposition of juveniles not in custody); adjournments had not been requested previously; the State's error in failing to timely provide the discovery was not intentional; the juvenile requested an adjournment, not dismissal, and did not object to the State's request; and the interests of

---

system with the local planning process encompassing the trial court administrators, the county prosecutor and public defender, the sheriff, the chief probation officer, the county bar president, the deputy clerk of the Superior Court, representatives of the municipal court, president of the county police association, the municipal prosecutor and other persons involved in the criminal justice system. *The Planning Conference Manual for Conference on Criminal Delay Reduction* (Administrative Office of the Courts ed., Sept. 15, 1980).

[4]The Principles and Operating Procedures for the Family Division, September 1991.

justice will best be served by an adjudication on its merits. If the allegations here are true, we have a very troubled juvenile who is in need of treatment. Perhaps early intervention will prevent his graduation to the adult court.

The matter is reversed and remanded for a hearing before a judge other than the judge who entered the dismissal. The assignment judge of the vicinage shall make the judicial assignment.

Reversed and remanded for a hearing.